[Crim. No. 2013.   Second Appellate District, Division One.—December 2, 1930.]

THE PEOPLE, Respondent, v. WALTER L. STINE, Appellant.

158

Willard J. Laney, Arthur C. Webb and James MacIntosh for Appellant.

U. S. Webb, Attorney-General, and Alberta Belford, Deputy Attorney-General, for Respondent.

HOUSER, J.—Appellant Stine and three others, named respectively Anderson, Duke and Sworfford, were charged with the crime of "possession of a still", a felony. Several days after the trial of the defendants had commenced and in the course thereof, defendant Anderson "disappeared". Thereupon, by order of the trial court, a mistrial was directed as to defendant Anderson only. The trial proceeded as to the remaining defendants, with the result that a verdict of "guilty" was returned against each of them. Other than defendant Stine, each of the convicted defendants was admitted to probation. It is from the judgment and the order by which his motion for a new trial was denied that defendant Stine has appealed to this court.

As disclosed by the evidence adduced on the trial of the action, the pertinent facts which related to the guilt of defendant Stine appear to be as follows:

Stine was the owner of a twenty-acre tract of land on which he was producing sand and gravel for commercial purposes. Among other things, the equipment used by Stine in the prosecution of his business were an office building, a bunkhouse, sand bunkers, galvanized iron sheds, scales, two steam-shovels, a toolhouse and a blacksmith-shop. In one corner of an inclosure of the size approximately seventy by seventy-five feet was located a shed which, in part, covered a pit of about sixteen by eighteen feet. The distance between the office occupied by defendant Stine and

the shed was 396 feet. The larger inclosure was used by defendant Stine and his employees for the purpose of parking their automobiles during the daytime when the sand and gravel plant was being operated; also by truck drivers, numbering between fifty and seventy per day, who called at the plant for the purpose of procuring and hauling away sand and gravel, which in the aggregate averaged between ten and fifteen thousand tons per month. Connected at one end with a pipe which led from one of the steam-shovels used by defendant Stine in loading sand and gravel into trucks was a steam hose which at its other end connected with another pipe which led to a still which was located in the shed. A raid on the still occurred at night, at about 7:30 P. M. At the time the raid was made all the defendants other than Stine were in the pit where, in addition to the still, were found several gallons of alcohol which had been redistilled from other alcohol unfit for beverage purposes, of which five barrels were also found in the shed. The still was slightly warm and, according to the testimony of the arresting officers, the steam-gauge on the still showed from ten to fifteen pounds pressure; which latter fact, however, was accounted for by the production in court of the gauge and testimony to the effect that it was defective and always registered ten to fifteen pounds pressure even when not in use. No fire was found under the boiler of the steam-shovel; nor was the steam hose connected either with the steam-shovel or with the still, but was stored in the blacksmith-shop.

In explanation of the circumstances hereinbefore set forth, defendant Stine testified that for a period of more than six months next preceding his arrest he had not for any purpose used the shed where the pit was located; that approximately two weeks next preceding his arrest he had leased the shed to the Bay Cities Oil Company and a man named Walter Wilson, who said that ''he wanted a place to blend oil; . . . he went around and picked up the crankcase drainage and refined it, and took the dirt out and added a Western oil and he sold it''. The lease between the parties was identified by defendant Stine and filed as an exhibit in the case. Also, a letter, of which the following is a copy, was introduced in evidence:

"Burbank, California, February 10, 1930.
"Bay Cities Oil Company,
  "Mr. Walter Wilson,
      "San Pedro, Calif.
"Dear Sir:
  "Confirming our conversation of a few days ago, it is my understanding in connection with your lease of a part of my garage that I am to dig a pit 12x16x16 feet for use for your oil vats, etc.; this pit to be lined with concrete. For this work I am to receive five hundred dollars cash; this in addition to your rent of one hundred dollars per month.
  "It is also my understanding that I am to furnish you a certain amount of steam for heating, etc., during my working hours. In event you would require me to furnish steam other than my regular working house, you will pay me at the rate of $1.50 per hour. You are to keep your building clean and free from fire hazard at all times and open to inspection by myself when I feel it is necessary.
                    "Yours truly,
                        "WALTER L. STINE,
                    "By (Signed) 'STINE'."
  Defendant Stine also testified that within a week following the execution of the lease he bought a new steam-shovel and that, in accordance with the understanding between him and the Bay Cities Oil Company, he constructed the pit mentioned in his communication to that company; that immediately thereafter the lessee paid him the $500 agreed upon, together with $100 for the first month's rent, and went into possession of the leased premises; that thereafter Stine saw Wilson deliver at the shed a tank "about four feet in diameter by about eight feet high"; also that he saw Wilson move into the shed, "I would say two days before the arrest I seen a flat rack truck load of oil drums, supposedly oil drums, black drums . . . about 45 or 50-gallon oil drums . . . I would say about 12."
  Stine gave further testimony that, after the pit was constructed, he never was inside either the pit or the shed; that on the day of the arrest of the defendants other than himself, on driving his automobile in the street on which the shed faced, he had noticed the odor of alcohol and had become somewhat suspicious of the business which was being conducted in the shed or pit; but that it was not until later

in the day, that is, between 3:30 and 4 o'clock P. M., at which time his suspicions were again aroused, that he ordered his foreman, Sworfford, to extinguish the fire under the boiler of the steam-shovel and to detach the steam hose; and it was at that time that the steam hose was disconnected and placed in the blacksmith-shop. At the same time defendant Stine directed his employee Sworfford "to go in there and see what was going on".

Defendant Sworfford testified that in the capacity of foreman of the sand and gravel business he had been in the employ of defendant Stine for several years next preceding the date of his arrest; that at about 3:30 o'clock P. M. on the day of his arrest defendant Stine said to him: "There is something wrong over there. Go over there and cut that fire out of that shovel and take that hose off of there and take it over to the blacksmith shop, and then, when you are through at 6 o'clock, go in there and see what is going on. He said, 'Get in there if you have to tear in there.' "

At about 7 o'clock P. M. Sworfford and defendant Duke —the latter of whom for several years next preceding the date in question had been a truck driver in the employ of defendant Stine—went into the shed in which the still was located. It was dark; the shed and pit were unlighted, but Duke used a flashlight. A few minutes after Sworfford and Duke entered the shed, defendant Anderson, who was a stranger to them, came into the shed. He said he was looking for Wilson who had employed Anderson to work for him. It was at about that time that the officers arrived and placed Sworfford, Duke and Anderson under arrest. Defendant Stine was not arrested until the following day. Defendant Duke corroborated the testimony of defendant Sworfford.

Defendant Anderson testified that in the morning of the day on which he was arrested he was introduced to Wilson, who employed him "to watch steam gauges and pressure gauges"; that on arriving at the place where he was supposed to work, which was at about 7 o'clock P. M., after some delay, he heard voices in the shed or pit, and on entering the shed he saw defendants Sworfford and Duke, who were strangers to him, of whom he inquired for Wilson.

After he had been there "probably fifteen minutes . . . just looking around . . . heard some one say, 'police officers, open the doors'." He was then placed under arrest.

A truck driver named Norstrom testified that he was employed by the Tec-Art Studio; that he was acquainted with Wilson, who told him about his having leased the shed and pit for the purpose of blending oil therein.

The first point made by appellant is that the evidence adduced on the trial of the action was insufficient to support the verdict.

As far as concerns the guilt of defendant Stine, the effect of the evidence is that, in the night-time, a still was found by police officers on a part of certain premises owned by said defendant, at which time two persons, each of whom was then and for several years theretofore had been, during regular daytime working hours, in the employ of said defendant in his business of producing sand and gravel, were in the room where the still was located; also that the still had been operated by means of steam which was generated in a boiler used by defendant Stine in his sand and gravel business.

Section 1 of the "Still Act" (Stats. 1927, p. 497), provides that "any person . . . who shall be the owner of or have any interest in or who shall operate or cause to be operated or knowingly have in his possession or control, any still . . . shall be guilty of a felony . . . ".

By the information herein, in substance the defendants were accused of the crime of "possession of a still" in that they "did wilfully, unlawfully and feloniously have an interest in, own, operate and caused to be operated, and knowingly have in their possession and under their control a certain complete still, . . . ".

The question, then, presented to this court is whether the bare facts that, in the night-time, in the presence of one's daytime employees, a still is found on one's property. which is capable of being operated by power furnished by the owner of the property, supply sufficient evidence to legally prove that such an owner "did wilfully, unlawfully, and feloniously have an interest in, own, operate and cause to be operated, and knowingly have in his possession and under his control" such still.

█ It will be noted that the accusation is conjunctive in form, in that it charges the defendants with the ownership, the operation and the possession and control of a still. But in order that the judgment herein be sustained, a verdict by the jury need rest only upon facts from which it may follow that the defendant Stine owned, or operated, or was in possession and control of the inhibited property. (*People* v. *Thompson*, 111 Cal. 242 [43 Pac. 748], and authorities cited in 14 Cal. Jur. 61 et seq.)

Subdivision 11 of section 1963 of the Code of Civil Procedure is to the effect that a disputable presumption of ownership of a thing follows from the possession of it; and (without so deciding) it may be that where the question at issue is as to who is the operator of a still, the person in possession of it may be subject to a like presumption. But it will at once appear that, in order that the presumption of ownership, or that of the personal operation of a still, may become effective, the pre-existing element of possession must be present; and it is obvious that in establishing the charge that a defendant "knowingly had in his possession" a still, the question of whether the condition of physical possession by the defendant was present constitutes a vital issue to be determined by the jury. So in the instant case, in any aspect in which the evidence assumed to be in support of the verdict be viewed, in the first instance, its validity must depend upon its sufficiency in the proof of possession.

At once, it is plain that the inquiry affects not only the liberty of the appellant in this proceeding, but as well may affect the 'possible interest of many individuals. As an illustration: Take the situation of the owner of an apartment house who has let to a stranger a suite of rooms at a certain price, which includes the cost of water, light and gas to be furnished by the owner. If, unknown to the owner of the property, the tenant should install a still in his apartment and use the gas furnished by the owner of the property as the means of distilling intoxicating liquor therein, and on a raid being made by the police of the premises, the still should be discovered in the presence of the janitor of the apartment house—a state of facts analo-

gous to the condition obtaining in the instant case would be presented.

Relating to that kind of possession from which the presumption of ownership may be inferred, it is manifest that to become effective the "possession" must be something more than a mere fleeting, physical retention of the thing in question. The condition must be such that the claimant may honestly exercise his power over the thing to the exclusion of all others; and is denoted by acts of dominion over it. (*Rice* v. *Frayser,* 24 Fed. 460; *Gilkerson-Sloss C. Co.* v. *London,* 53 Ark. 88 [7 L. R. A. 403, 13 S. W. 513]; *Staton* v. *Mullis,* 92 N. C. 623.) It may be said that the precise acts which will or may indicate a dominion over a thing to the exclusion of all others are incapable of being either accurately specified or described. The determination of whether the acts or conduct of a person in whose physical possession a thing may be held or retained amount to such right of dominion over it as to legally entitle him to it to the exclusion of all others, ordinarily would rest with a conclusion thereon by the jury to which the question might be submitted. In order to be binding upon an appellate tribunal the verdict of the jury must rest upon such substantial evidence that it will stand the test of legal principles applicable to the situation. In the instant case it is apparent that the liberty and the good name of the defendant may depend upon the disputable presumption that "possession" of a thing by the defendant indicates its ownership by him; and that a determination of the question of whether the defendant was "possessed" of the thing may depend upon such slight, ambiguous, incriminatory, conduct that, established as a judicial precedent, will or may threaten the liberty and the good reputation of many innocent and law-abiding citizens.

It was incumbent upon the prosecution to prove "possession" beyond a reasonable doubt. As far as indicating the guilt of defendant Stine was concerned, his acts or conduct, whether actual, or only imputed to him, were altogether ambiguous. Without other incriminatory evidence, such acts and conduct were as consistent with the innocence of defendant Stine as they were with his guilt; and in such circumstances the rule of law is that a verdict of "guilty"

should not be returned. Nevertheless, as a matter of law, this court cannot declare that, in concluding that the evidence to which reference has been had was sufficient to show beyond a reasonable doubt that the defendant was the owner, the operator, or in possession and control of the still in question, the jury was transcending its legal powers. However, there remains a question as to whether the verdict was the result of passion and prejudice.

■ Where the appeal involves the question of the sufficiency of the evidence to support the verdict of the jury, the power of the court in the premises is succinctly stated in the case of *People* v. *Willard,* 150 Cal. 543, 553 [89 Pac. 124, 128], and repeated in *People* v. *Niino,* 183 Cal. 126, 128 [190 Pac. 626], as follows: "This court cannot disturb a verdict unless there is no evidence to support it, or where the evidence relied on by the prosecution is apparently so improbable or false as to be incredible, *or where it so clearly and unquestionably preponderates against the verdict as to convince this court that its return was the result of passion or prejudice on the part of the jury."*

The case of *People* v. *Wong Chong Suey,* 110 Cal. 117, 121 [42 Pac. 420, 421], contains a statement to the effect that the finding of the jury will not be disturbed "unless the evidence preponderates so greatly against the verdict as to make it manifest that the verdict is the result of passion or prejudice".

And in the case of *People* v. *Acosta,* 10 Cal. 195, the syllabus is that: "Where it is manifest, from the testimony stated in the record, that the verdict of the jury must have been given under a state of great excitement, preventing a fair and just trial, . . . this court will reverse the judgment, . . . "

See, also, *People* v. *Sullivan,* 129 Cal. 557, 560 [62 Pac. 101]; *People* v. *Manning,* 48 Cal. 335; *People* v. *Hamilton,* 46 Cal. 540; *People* v. *Vance,* 21 Cal. 400; *People* v. *Benson,* 6 Cal. 221 [65 Am. Dec. 506]; *People* v. *Harden,* 24 Cal. App. 522 [141 Pac. 1075]; also, authorities cited in 8 Cal. Jur. 591.

Remembering the substance of the evidence which tended to establish the guilt of defendant Stine, for the purpose of considering the probable "state of mind" of the jury

at and preceding the time when the verdict was returned, it becomes necessary to again briefly review the evidence offered by defendant Stine in his defense.

Stine was the owner of and engaged in operating an extensive business. At the solicitation of Bay Cities Oil Company and Wilson, for the consideration of $500 paid to Stine, he constructed a pit under an unused shed located approximately 400 feet from his business office, and thereupon leased the shed and pit to Bay Cities Oil Company and Wilson for the purpose of refining and blending oil therein, at a rental of $100 per month, including steam to be furnished during·daytime working hours—extra time at $1.50 per hour. The first month's rent of the premises was also paid. The lessee (Wilson), who was identified by a disinterested person, took possession of the premises and moved thereon a large tank and several iron drums. The lease, also a letter written by Stine to the Bay Cities Oil Company and Wilson, which letter amplified the terms of the lease, were introduced in evidence. After the pit was constructed, Stine never was inside the shed or pit until after the night when his co-defendants were arrested. Steam had been connected with the still but two days when the arrest occurred. On that day, owing to the fact that the suspicions of defendant Stine had been aroused regarding the legitimacy of the business conducted in the shed, he had the steam disconnected and ordered defendant Sworfford to "investigate". Unknown to Stine, after his usual daytime labors had been finished, Sworfford took Duke with him to "see what was going on" in the shed, which at that time was dark and unlighted. While so engaged, defendant Anderson, who was a total stranger to all the other defendants, and who on that day had been employed by Wilson to "watch steam gauges", came into the shed, and the arrest of the three defendants occurred within ten or fifteen minutes thereafter.

Other than by cross-examination of the several witnesses who testified to the foregoing facts, no attempt was made by the prosecution to rebut such facts or to challenge their correctness in any way. As far as the record discloses, the testimony given by each of the witnesses for the defense was entitled to full credit. Stine was a reputable business

man engaged in conducting a legitimate business. In his employ were defendants Sworfford, as foreman, and Duke, as a truck driver, each of whom had been regularly so employed for several years next preceding the date of the arrest. Anderson was a total stranger to either of his co-defendants. The good reputation of none of the witnesses was in any way questioned.

█ Considering such evidence, it is difficult, if possible, to appreciate either the attitude or the reasoning of the jury in the premises. The evidence adduced by the prosecution was barely sufficient to establish even a *prima facie* case of guilt of the defendants. To a very considerable extent it depended upon a disputable presumption of ownership, which presumption was based upon ambiguous facts which were just as consistent with the innocence of the defendant as they were with his guilt. In any criminal case, in order to acquit the defendant, all that the law demands is that a reasonable doubt of his guilt be established by competent evidence. In the instant case, not only was trustworthy evidence introduced which was sufficient to raise such a doubt, but it clearly preponderated in favor of the innocence of the defendant. To assume that through some untoward influence the jury was prejudiced against the defendant, would appear to be the only way by which to account for its verdict. It would seem certain either that the verdict of the jury was given "under a state of great excitement" (*People* v. *Acosta*, 10 Cal. 195), or that "its return was the result of passion or prejudice on the part of the jury". (*People* v. *Willard*, 150 Cal. 543, 553 [89 Pac. 124]; *People* v. *Niino*, 183 Cal. 126, 128 [128 Pac. 626].)

It becomes unnecessary to consider other points urged by appellant for reversal.

It is ordered that the judgment and the order by which defendant's motion for a new trial was denied be and they are reversed.

Conrey, P. J., and York, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 16, 1930.